1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES OF AMERICA,                    No.  2:07-cr-0139 WBS AC P

12                     Plaintiff/Respondent,

13          v.                                      <u>FINDINGS AND RECOMMENDATIONS</u>

14    RICHARD NUWINTORE,

15                     Defendant/Petitioner.

16

17          Petitioner Richard Nuwintore seeks coram nobis relief from his 2011 conviction for credit

18    card fraud, on grounds that his guilty plea was induced by the ineffective assistance of trial

19    counsel.  <u>See</u> ECF No. 140 (Amended Petition for Writ of Coram Nobis).  Petitioner alleges that

20    trial counsel Christopher Haydn-Myer failed to competently advise him regarding the

21    immigration consequences of his plea.  <u>Id.</u>  An evidentiary hearing was held before the

22    undersigned on January 22, 2018.  ECF No. 181.  Mr. Nuwintore testified on his own behalf, and

23    Mr. Haydn-Myer testified for the government.  <u>Id.</u>  Post-hearing briefs were filed by both parties

24    on April 9, 2018.  ECF Nos. 191, 192.

25          For the reasons set forth below, the undersigned now recommends that the coram nobis

26    petition be denied.

27    ////

28    ////

1                                    I.    BACKGROUND

2          Petitioner, a citizen of Burundi who had previously been granted asylum in the United

3   States, was charged in 2007 with two counts of credit card fraud in violation of 18 U.S.C. §

4   1029(a)(2).  See ECF No. 9 (Indictment).  On December 9, 2010, five days before trial was set to

5   begin, he pled guilty to Count One pursuant to a plea bargain.  ECF Nos. 113, 115.[1]  Petitioner

6   was sentenced to 14 months imprisonment and 36 months supervised release, and ordered to pay

7   restitution in the amount of $13,301.11.  ECF No. 126 (Judgment and Commitment order).  The

8   plea agreement contained a waiver of appeal and collateral attack, ECF No. 115 at 7-8, and

9   petitioner did not appeal or file a motion under 28 U.S.C. § 2255 within the time provided by law.

10         On October 5, 2011, the Department of Homeland Security ("DHS") charged petitioner as

11  removable from the United States under the Immigration and Nationality Act ("the Act"), section

12  237 (a)(2)(A)(iii), by reason of his conviction of an aggravated felony.  Petitioner contested

13  removability, and also applied for relief from removal in the form of (1) withholding of removal

14  under section 241(b)(3) of the Act, and (2) withholding of removal under Article III of the

15  Convention Against Torture.  On April 25, 2012, the Immigration Court held a hearing on

16  petitioner's application.  On May 22, 2012, the court found that petitioner's conviction for credit

17  card fraud constituted an aggravated felony within the meaning of the Act, because (1) it involved

18  fraud or deceit, and (2) the loss to the victims exceeded $10,000.  ECF No. 140-4 at 13.

19  Accordingly, the court sustained the charge of removability.  Id.  However, petitioner was granted

20  withholding of removal pursuant to section 241(b)(3), on grounds that he had previously

21  experienced political persecution in Burundi and faced a clear probability of further persecution if

22  returned to that country.  Id. at 18-22.  In sum, the immigration court found that petitioner could

23  not safely return to Burundi.  Id. at 22.  Withholding of removal had the effect of permitting

24  petitioner to remain in the United States, out of custody and eligible to work, but ineligible to

25  regain his permanent resident status, seek citizenship, or reenter the country if he were to travel

26  abroad.

27

28  [1]  Count Two was subsequently dismissed on the government's motion.

                                              2

This coram nobis proceeding was initiated on September 25, 2014, and referred to the undersigned. ECF Nos. 131, 132. Respondent moved to dismiss the petition as barred by the plea agreement's waiver of collateral attack. ECF No. 143. On March 11, 2015, the undersigned recommended that the motion be granted, ECF No. 150, and the District Judge adopted the recommendation on September 2, 2015, ECF No. 153. Petitioner appealed, and the Ninth Circuit reversed and remanded for an evidentiary hearing on the merits of petitioner's ineffective assistance of counsel claim. ECF No. 157 (Memorandum disposition filed May 23, 2017).

## II.     STANDARDS

### A. Coram Nobis

Coram nobis is an extraordinary form of relief, available to challenge the validity of a conviction after the sentence has been fully served, "under circumstances compelling such action to achieve justice." United States v. Morgan, 346 U.S. 502, 511 (1954). The writ of coram nobis allows a court to vacate its judgment "for errors of fact . . . in those cases where the errors [are] of the most fundamental character, that is, such as rendered the proceeding itself invalid." United States v. Mayer, 235 U.S. 55, 69 (1914). To qualify for coram nobis relief, a petitioner must demonstrate that: (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character. United States v. Riedl, 496 F.3d 1003, 1006 (9th Cir. 2007). The fundamental error requirement is met by a showing that petitioner received ineffective assistance of counsel in the trial court, in violation of Sixth Amendment standards. United States v. Mett, 65 F.3d 1531, 1534 (9th Cir. 1995).

### B. Ineffective Assistance of Counsel

To establish a constitutional violation based on ineffective assistance of counsel, a petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 692, 694 (1984). In evaluating counsel's performance, the court must apply a strong presumption that counsel's representation fell within the wide range of reasonable

professional assistance.  <u>Strickland</u>, 466 U.S. at 689.  Prejudice means that the error actually had an adverse effect on the defense.  There must be a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  <u>Id.</u> at 693-94.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  <u>Id.</u>  These standards apply in the plea context.  <u>Hill v. Lockhart</u>, 474 U.S. 52, 57 (1985).

Objectively unreasonable advice regarding the immigration consequences of a plea can constitute deficient performance within the meaning of <u>Strickland</u>.  <u>Padilla v. Kentucky</u>, 559 U.S. 356, 366 (2012).  Specifically, to perform as the counsel contemplated by the Sixth Amendment, "counsel must inform her client whether his plea carries a risk of deportation." <u>Id.</u> at 374.  When a guilty plea to a particular offense will render removal a "virtual certainty," counsel's failure to so advise her client constitutes deficient performance as a matter of law.  <u>United States v. Rodriguez-Vega</u>, 797 F.3d 781, 786 (9th Cir. 2015).

In order to show prejudice from unreasonable advice regarding a plea, petitioner must show "a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial."  <u>Hill</u>, 474 U.S. at 57.  More specifically, where counsel fails to advise that a plea will render removal a "virtual certainty," prejudice is established where the petitioner establishes a reasonable probability that he could and would have negotiated a different plea agreement not requiring removal had counsel provided adequate advice, or that he would have gone to trial.  <u>Rodriguez-Vega</u>, 797 F.3d at 788.

The prejudice inquiry demands a case-by-case examination of the totality of the evidence regarding the decision to accept the plea.  <u>Lee v. United States</u>, 137 S. Ct. 1958, 1966-67 (2017).  Prejudice does not require a showing that petitioner would have been better off going to trial; an ineffective assistance claim may succeed even where the likelihood of a more favorable trial outcome is slim to none, if petitioner would have taken that slim chance rather than plead guilty and face virtually certain deportation.  <u>Id.</u>  However, petitioner's trial prospects may be considered as part of the totality of the evidence regarding the decision to accept a guilty plea.  <u>Id.</u>
////
////

4

III.    FINDINGS OF FACT

A.    The Documentary Record

The following facts are undisputed, and are well supported by the record and by the exhibits admitted into evidence at the evidentiary hearing.

1.    Immigration Proceedings Prior To Petitioner's Prosecution

Petitioner is a native and citizen of Burundi.  His father, a former Burundian government official, became an outspoken critic of the government.  Petitioner joined the youth faction of the opposition organization with which his father was affiliated, and became a high-ranking member. In 1991, petitioner's father was arrested by Burundian military personnel.  He died in government custody.  Although the family was told that he had died of natural causes, petitioner later learned that his father had been killed because he spoke out against government corruption.  See ECF No. 140-4 (Decision and Order of the Immigration Court dated May 22, 2012).

Petitioner first came to the United States on a student visa in 1992.  When he returned to Burundi in 1995, he was apprehended at the airport upon arrival, interrogated and beaten, and detained for twenty-seven days.  The abuse continued throughout petitioner's detention.  Id.

On August 6, 1996, petitioner was granted asylum status in the United States.  The immigration court found that petitioner had been politically persecuted and faced further persecution if he returned to Burundi.  Petitioner became a lawful permanent resident ("LPR") in September 2000.  Id.

2.    Initial Proceedings in This Court

On March 21, 2007, Mr. Nuwintore was charged in a criminal complaint with access device fraud.  ECF No. 1.  The supporting affidavit alleged that he had used fraudulently obtained credit cards to purchase airline tickets for himself and others.  The affidavit provided details of two such tickets which Mr. Nuwintore had used personally, and asserted that the total loss to Southwest and United Airlines from the fraudulent scheme was $263,497.41.  Id. at 3-4.  At Mr. Nuwintore's initial appearance on March 27, 2007, Assistant Federal Defender Mary French was appointed to represent him.  ECF No. 4.

////

A two-count indictment was returned on April 5, 2007.  ECF No. 9.  The indictment alleged as follows:

> COUNT ONE:  [18 U.S.C. § 1029(a)(2) – Access Device Fraud]
>
> The Grand Jury charges: THAT
>
> RICHARD NUWINTORE, defendant herein, from approximately February, 2003, through approximately February, 2005, in the County of Sacramento, State and Eastern District of California, and elsewhere, knowingly and with the intent to defraud, did use one or more unauthorized access devises during a one-year period, and by such conduct obtained things of value aggregating $1,000 or more during that period, such conduct having an effect on interstate commerce, all in violation of Title 18, United States Code, Section 1029(a)(2).
>
> COUNT TWO: [18 U.S.C. § 1029(a)(2) – Access Device Fraud]
>
> The Grand Jury charges: THAT
>
> RICHARD NUWINTORE, defendant herein, from approximately April, 2004, through approximately January, 2006, in the County of Sacramento, State and Eastern District of California, and elsewhere, knowingly and with the intent to defraud, did use one or more unauthorized access devises during a one-year period, and by such conduct obtained things of value aggregating $1,000 or more during that period, such conduct having an effect on interstate commerce, all in violation of Title 18, United States Code, Section 1029(a)(2).

Id.

Malcolm Segal substituted into the case as CJA counsel on May 10, 2007.  ECF Nos. 17, 24.  On March 29, 2010, U.S. District Judge William Shubb granted Mr. Segal's motion to withdraw.  ECF No. 82.  Christopher Haydn-Myer took over petitioner's defense on April 9, 2010.  ECF No. 85.

      3.  <u>Communications Between Prosecution and Defense Prior To Change of Plea</u>

Assistant U.S. Attorney Matthew Segal sent a letter to Mr. Haydn-Myer dated November 9, 2010, which briefly described some of the government's evidence against Mr. Nuwintore and conveyed a pre-trial plea offer.  Govt. Ex. 5 to Evd. Hrg.  The letter noted that no previous offer had been made, because there had been no indication that Mr. Nuwintore was interested in a plea. The offer was as follows: (1) Defendant would plead guilty to Count One, admit to a factual basis that included only the single $1,029.81 ticket involved in the flight that resulted in his arrest, and

waive appeal and collateral attack; (2) the Government would move to dismiss Count Two; and (3) the parties would reserve all other arguments about sentencing and leave the final decision to Judge Shubb. Id. This offer was not accepted.

On December 7, 2010, one week before trial was set to begin, Mr. Haydn-Myer filed a motion to continue the trial to January 4, 2011. ECF No. 103. The first stated reason for the requested continuance was as follows: "On the afternoon of December 6, 2010, Mr. NUWINTORE informed counsel that he wanted to discuss resolving his case with the government. This was the first time that counsel was made aware that Mr. NUWINTORE would enter into a plea." Id. at 3. Counsel also explained that he required additional time "to research the impact of a plea on Mr. NUWINTORE's ability to remain in the United States." Id. Counsel stated that he had sent an email inquiry to an immigration expert on December 6, but had not yet received a reply. Id. at 3-4. Other grounds for the request involved outstanding defense subpoenas for airline records, and the availability of a witness. Id. at 4-5. The motion was set for hearing on December 9, 2010. ECF Nos. 103, 107.

4. The Plea Agreement

On December 9, 2010, defendant changed his plea pursuant to a plea bargain. ECF No. 113. The written plea agreement specified that petitioner would plead guilty to Count One of the indictment, and the government would move to dismiss Count Two. The government agreed to recommend that petitioner be sentenced within the applicable guideline range for his offense as determined by the Probation Office. ECF No. 115 at 2-4.

a. Stipulated Factual Basis

The stipulated factual basis attached to the plea agreement reads in its entirety as follows:

> From 2003 through 2007 the defendant used other people's credit cards without their authorization to purchase airline tickets for himself and others. The parties agree that the provable loss personally attributable to the defendant is $13,301.11.
>
> Documents from Southwest Airlines show $2,386.00 in fraudulent credit card transactions linked to the defendant either because he was the passenger, the e-ticket for someone else was emailed to the defendant, or the e-ticket was for a person who had used Western Union to send money to the defendant. When the reservations were

made, the defendant entered credit card billing addresses other than his own.

Documents from United Airlines show $10,915.11 in fraudulent credit card transactions linked to the defendant either because he was the passenger, an e-ticket for someone else was emailed to the defendant, or the e-ticket was for a per-son who had used Western Union to send money to the defendant.

One ticket that the defendant purchased without authorization on someone else's credit card was the one that he used to fly on United Airlines from Sacramento, California to Reagan National Airport in Virginia. The flight was on February 18, 2005 and the ticket cost approximately $1,029.80. The credit card used to purchase this ticket belonged to Sharon B. In purchasing the ticket, Nuwintore entered his own name as the passenger name, but the credit card and credit card billing address of Sharon B. The e-ticket was emailed to a Yahoo email account controlled by Nuwintore and opened in the Sacramento area within a week of the ticket purchase.

The conduct affected interstate commerce as some or all of these flights were interstate flights.

ECF No. 115 at 11.

      b.  <u>Immigration Consequences</u>

The plea agreement provided in relevant part as follows:

**Impact of Plea on Defendant's Immigration Status:** Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty. Indeed, because defendant is pleading guilty to access device fraud with a loss over $10,000, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

ECF No. 115 at 9.

      c.  <u>Attorney-Client Communication Regarding Plea Agreement</u>

On the morning of the coram nobis evidentiary hearing, Mr. Haydn-Myer disclosed certain documents from his case file to the government for the first time. <u>See</u> EH 4-5, 12-13. These materials included a letter from Mr. Haydn-Myer to Mr. Nuwintore dated December 8,

8

2010.  Govt. Ex. 14.  The letter reads as follows:

December 8th, 2010

Richard Nuwintore
READ TO AT THE SACRAMENTO
JAIL ON THIS DATE

Re:  New Offer, Expires at 12:00 today

Dear Richard,

This letter is to assist our understanding of the offer that was made to me late yesterday afternoon by AUSA Matthew Segal.  There were two offers made and they both expire at 12:00 today.

First, you must plead guilty to Count 1, and then we would argue to the Court the amount of loss.  The range would be $1,000 at a minimum, and the high would be the very highest dollar amount the prosecution could argue for under the law.  You would receive a two-level reduction.

Second, you would admit all financial loss where you were a passenger on an airline that was purchased with a fraudulent credit card.  Second, you would admit loss for all of the Western Union transfers to you by a passenger where the confirmation or ticket was sent to an email address linked to you.  Third, United Airlines would receive $10, 915.11.  Fourth, Southwest would receive $2,386.00.  The loss would be between $10,000 and $30,000.

The Guidelines range would be as follows:  [omitted]

The sentencing range for a level 12 is 10-16 months for a CH I, and 12-18 months for a CH II.

You would be deported under this plea.

Sincerely,

Chris Haydn-Myer

Govt. Ex. 14.

5.  Pre-Plea Events of December 9, 2010

When the case was called on the morning of December 9, Mr. Haydn-Myer reported that

he had been in conversation with both his client and the AUSA that morning, and that the parties

were in the process of finalizing a plea deal.  ECF No. 129 (Transcript of Proceedings) at 1.  The

defense requested that the matter be put over to the afternoon for a change of plea.  Id. at 1-2.

////

6. <u>The Rule 11 Colloquy</u>

At the change of plea hearing on the afternoon of December 9, 2010, the following

exchange took place:

> THE COURT: Are you a citizen of the United States?

> THE DEFENDANT: No, I'm not.

> …

> THE COURT: Do you understand that your plea of guilty could
> result in your being deported from the United States?

> THE DEFENDANT: Yes, Your Honor.

> THE COURT: Mr. Haydn-Myer, you had made some reference to
> that in one of your pleadings to the Court. Have you had an
> opportunity to consult with outside immigration counsel on this
> matter?

> MR. HAYDN-MYER: Your Honor, I didn't -- I did receive an e-
> mail back from the organization, Mr. Smith, as the Court correctly
> discussed. I believe that Mr. Nuwintore would be facing deportation
> charges based on this. It's actually written into the plea agreement.
> He's been advised of his rights that, based on this plea, it is our belief
> that he will mandatorily be -- his citizenship or any attempt for his
> citizenship would be revoked, and he would be deported.

> THE COURT: And have you had a full opportunity to explore that
> with outside counsel?

> MR. HAYDN-MYER: Not a full opportunity, but I did have time to
> research it.

> THE COURT: And you're satisfied that the advice that you're giving
> to Mr. Nuwintore is correct?

> MR. HAYDN-MYER: Yes, Your Honor.

> THE COURT: All right. So, Mr. Nuwintore, do you understand that
> your plea of guilty will probably result in your being deported from
> the United States?

> THE DEFENDANT: Yes, Your Honor.

ECF No. 129 (Transcript of Proceedings, December 9, 2010) at 6-8.

Petitioner orally waived his trial rights and his right to appeal or collaterally attack his

conviction. <u>Id.</u> at 10. He confirmed the accuracy of the facts set forth in the stipulated factual

////

basis. Id. at 13-14. The court accepted petitioner's plea, finding it freely and voluntarily made. Id. at 15.

### 7. Sentencing Proceedings

The initial Presentence Report ("PSR") found that petitioner was responsible for a total loss amount of $263,497.41. A revised PSR was submitted on May 3, 2011, amending the loss amount to $13,301.11, the amount stipulated in the factual basis to the plea agreement.

On June 6, 2011, petitioner filed Amended Formal Objections to the May 3, 2011, PSR. Petitioner disputed for purposes of restitution the $10,915.11 loss amount specified for United Airlines. ECF No. 120 (Amended Formal Objections). Petitioner first contested the accuracy of an allegation that he had personally used a particular airline ticket, id., and then challenged more broadly the evidence on which the government relied for its loss amount calculations, ECF No. 122 (Reply to Excel Spreadsheet Provided by the Government).

An evidentiary hearing was held on July 5, 2011. ECF No. 125 (Minute Order). A Secret Service agent testified regarding the evidence linking Nuwintore to the loss. ECF No. 142 (Transcript of Hearing) at 8-54. Following the presentation of evidence, AUSA Segal argued that petitioner was taking a position contrary to the stipulated factual basis for the plea. Id. at 55-56. Judge Shubb noted that the stipulated Guidelines calculations in the plea agreement were based on a loss of $13,301.11. Id. at 56. When the judge asked Mr. Haydn-Myer what part of the stipulation defendant was withdrawing from, counsel consulted with Mr. Nuwintore and announced that defendant "wants to stay with the plea agreement. He doesn't want to back out of it." Id. Judge Shubb imposed sentence, including restitution in the total amount of $13,301.11. ECF Nos. 125, 126 (Judgment and Commitment). Petitioner was sentenced to 14 months imprisonment and 36 months supervised release. Id.

### B. The Testimony at the Coram Nobis Evidentiary Hearing

#### 1. Testimony of Richard Nuwintore

Mr. Nuwintore testified that he was aware throughout the pendency of his case that a plea agreement could have serious effect on his immigration status. Transcript of Evidentiary Hearing ("EH"), ECF No. 186, at 20-21. Mr. Nuwintore was adamant that he could not risk being

returned to Burundi, where his father had been murdered in custody, other family members had "disappeared," and where Mr. Nuwintore himself had been jailed and tortured. EH 17-19. He feared that he would be killed if he returned to Burundi. EH 20. He discussed these concerns with Mr. Haydn-Myer:

> He told me that it may be some legal consequences about my immigration status, that I might lose my, my, my immigration status, that I'll be deported and I said, I explained to him that I can't be deported because of whatever, you know, went, whatever I went through. . . .
>
> After I told him about the fear of me going back and it'd be a death sentence for me, he replied to me that he never heard with someone with political asylum being deported. So for me, it was like, no, I cannot be deported. I'll be safe for deportation and I'd keep my asylum status.

EH 20-21.

Mr. Nuwintore was aware prior to his change of plea that a loss amount over $10,000 would require his deportation, but he also believed that his asylum status would protect him. EH 22. His testimony was less than clear about the basis for that belief, and about what Mr. Haydn-Myer advised regarding the relationship between mandatory deportation, revocation of asylum status, and actual return to Burundi.

> THE COURT: Exactly what, to the best of your memory, what did Mr. Haydn-Myer tell you would be the consequence of admitting a loss over $10,000?
>
> MR. NUWINTORE: He told me that I might be deported, or I'll be deported at the end. That's what he said, but – and when I raised about my political asylum he replied that he never heard somebody with political asylum being deported.
>
> So my understanding was me being an asylee I thought, yes, the asylum will protect me about me going back to Burundi. Because that'll be really a death sentence for me to just agree to go back to where my life was probably in danger in 1995, I escaped death, and this time no chance.
>
> THE COURT: And what, if anything, did Mr. Haydn-Myer tell you about the legal effects of your asylum status on your removability pursuant to your plea?
>
> MR. NUWINTORE: He just told me that I'll be deported, that when I plead guilty it may have, you know, my immigration consequences.

THE COURT: And what did he say about the impact on that of the fact that you already had asylum?

MR. NUWINTORE: He said I'll be deported, but I'll be covered. My asylum will protect me.

THE COURT: Protect you from what?

MR. NUWONTORE: From deportation.

EH 23-24.

On cross examination, Mr. Nuwintore again testified that his lawyer told him "that I'll be deported, but I'll – but I'll – I won't be deported because of my political asylum." EH 50.

In their discussions of immigration consequences, counsel never addressed the distinction between petitioner's immigration status (as a lawful permanent resident or removeable alien) and actual return to Burundi. EH 60. They never discussed the concepts of removability and withholding of removal. EH 60. Mr. Haydn-Myer never explained what an aggravated felony was and why it mattered. EH 109.

Mr. Nuwintore testified that the plea offer he accepted on December 9, 2010, was the only plea offer that Mr. Haydn-Myer conveyed to him. EH 50-51. He was not shown the offer letter from Mr. Segal dated November 9, 2010, and does not remember it. EH 51. He did not tell his lawyer on December 6 that he wanted to pursue a settlement; the first and only conversation about a plea was on December 8 when Mr. Haydn-Myer came to the jail with an offer. EH 52-53. When shown Government's Exhibit 14, the December 8 letter to Mr. Nuwintore from Mr. Haydn-Myer regarding the offer, petitioner acknowledged recognizing the document and that it stated, "You'll be deported under this plea." EH 54-55.[2] Mr. Haydn-Myer told petitioner on December 8, without caveat, that he would be deported as the result of a plea. EH 55. Once again, petitioner followed this acknowledgement with insistence that Haydn-Myer had also told him, "With your political asylum, I don't think you'll be deported with political asylum." EH 55. The conversation(s) about political asylum as protection from deportation occurred well before December 8. EH 56.

_____

[2] Petitioner did not remember receiving the letter, although he said he recognized it. Id. Haydn-Myer testified that he did not give his client a copy, but read it out loud to him at the jail. EH 74.

Mr. Nuwintore signed the plea agreement on December 9, despite its inclusion of an immigration advisement he believed was incorrect, because Mr. Haydn-Myer told him to. EH 39. When asked on direct examination whether he relied more on the formal advisement he was given in court or on counsel's out-of-court representations, petitioner replied:

> I rely what he told me outside the court by, about my asylum was protecting me and then he, he read the paragraph in the plea saying that you, you know, you, you may have immigration consequences that going to lead to you being deported.
>
> So my understanding was if – he told me that nobody ever been deported with political asylum 'cause that was my concern just to be deported to a place where I can lose my life. I really stuck on that and then we went in front of the judge and that's when I pled guilty.

EH 25-26.

Mr. Nuwintore believed then and believes now that he was not actually responsible for a loss above $10,000, and he can identify facts that could have been used at trial to support that position. EH 26-32. Among other things, petitioner believes that he was a victim of identity theft and that other people were using his identity to commit fraud. EH 59. Had he understood in December 2010 that he would face deportation as a result of his plea, Mr. Nuwintore would have held out for a more favorable plea bargain or insisted on going to trial. EH 32. He would have done so even without affirmative evidence to support his loss theory. EH 31-32.

On cross-examination, Mr. Nuwintore testified that he knew the factual basis for the plea was inaccurate when he signed it, but that he did so at counsel's direction because Mr. Haydn-Myer told him, "'This is a good deal. Just sign it.'" EH 39. Counsel did not tell him the government had evidence to prove he was responsible for more than two fraudulent tickets, but did tell him that loss caused by a co-conspirator would be attributed to him. EH 49.

2. Testimony of Christian Haydn-Myer

Mr. Haydn-Myer became aware of Mr. Nuwintore's immigration status immediately upon receiving the case file from predecessor counsel Malcolm Segal. EH 63. He discussed the matter with his client at their first meeting. Id. Mr. Haydn-Myer was well aware that Mr. Nuwintore had asylum status and wished to retain it and avoid deportation. EH 64.

////

14

Mr. Haydn-Myer's initial discussions of the case with Mr. Nuwintore included review of the discovery; discussion of the strength of the government's case in light of the elements of the charged offenses and the applicable jury instructions; potential Sentencing Guidelines calculations; and possible immigration consequences. EH 64-65. The attorney-client conversations were an iterative process in which they "worked the case together to come to a conclusion together" on what Mr. Nuwintore concluded was in his best interest. EH 65. Regarding the likely immigration consequences of a conviction, by plea or following trial, Mr. Haydn-Myer generally did not make predictions to clients. His habit and custom is to explain the law, explain the facts, and allow the client to reach a conclusion with him. EH 66.

Mr. Nuwintore initially resisted the idea of plea negotiations and wanted to proceed to trial. EH 66. Mr. Haydn-Myer received a letter from the AUSA on or about November 9, 2010, proposing that Mr. Nuwintore plead guilty to Count One and stipulate to a factual basis including only the loss of one $1,029.81 airline ticket (Govt. Ex. 5). He "believes" that he conveyed this offer to his client. EH 67. He "believes" that they discussed the fact that the proposal would allow Mr. Nuwintore to avoid the mandatory deportation consequence of a $10,000 loss amount. EH 68-69. Although Mr. Haydn-Myer does not recall the specifics of a conversation with Mr. Nuwintore about the offer, he recalls knowing that the $10,000 aggravated felony threshold was the key to avoiding mandatory deportation. Accordingly, he can't imagine that he didn't advise his client that the November offer would avoid mandatory deportation. EH 69. Mr. Nuwintore rejected the offer. EH 68.

Mr. Haydn-Myer does not recall ever telling Mr. Nuwintore that his asylum status would prevent deportation, and does not recall ever believing that was the case. EH 69-70, 75. He does recall Mr. Nuwintore telling *him* on several occasions that other Burundi nationals who had been deported from the United States had gone to London or elsewhere rather than being returned to Burundi. EH 83-87. Mr. Nuwintore told counsel that "there is a provision [of immigration law] which allows the United States to not deport somebody to a country if they've got political asylum from it." EH 85. Mr. Haydn-Myer was unfamiliar with such provisions of immigration law, and testified that it was something that an immigration attorney would have to handle. EH

86.  He thought at the time of the plea that Mr. Nuwintore would be removed from the United

States but would, possibly due to his mother's United Nations connections and available family

resources, be able to go to London or another European destination rather than Burundi.  EH 84,

105-106.

Mr. Haydn-Myer never thought that Mr. Nuwintore could avoid deportation, meaning

removal from the United States.  EH 70.  Mr. Haydn-Myer believes he told Mr. Nuwintore that he

would be deported, as confirmed by (1) his documentation in the December 8 letter, which also

served as a "memo to the file" regarding attorney-client communications, that deportation would

result from the plea, and (2) his affirmative use of the word "deportation," which he usually

avoids using, in open court at the change of plea hearing.  EH 69-70; <u>see also</u> ECF No. 219

(Transcript of Change of Plea Hearing) at 7.[3]

Mr. Haydn-Myer does not recall consulting any immigration expert regarding Mr.

Nuwintore's situation.  EH 70.  His case file includes some information about immigration

consequences of convictions, but he does not remember doing the research.  EH 70.  Haydn-Myer

had previously taken some training and obtained general materials regarding immigration

consequences in criminal cases, and the implications for plea negotiations.  EH 71.  He reviewed

those materials for Mr. Nuwintore's case.  EH 72.  He tried to contact an expert at UC Davis on

December 6, 2010, at the suggestion of the Federal Defender's Office, but didn't hear back before

the change of plea.  EH 87-88; <u>see also</u> ECF No. 103 (motion to continue trial date) at 3-4.[4]

The December 6, 2010, motion for a continuance was occasioned by Mr. Nuwintore's

last-minute interest in considering a plea deal.  Mr. Haydn-Myer does not recall any of the

specifics regarding his December 6 conversation with his client.  EH 72-73.  He believes that on

December 8 he read aloud to Mr. Nuwintore the letter he had written to convey the government's

---

[3]  In response to Judge Shubb's question about immigration consequences, Mr. Haydn-Myer said that Mr. Nuwintore had "been advised of his rights that, based on this plea, it is our belief that he will mandatorily be – his citizenship or any attempt for his citizenship would be revoked, and he would be deported."  ECF No. 129 at 7.

[4]  The transcript of the change of plea indicates that Haydn-Myer did get an email back from Prof. Smith.  ECF No. 129 at 7.  The contradiction was not addressed at the evidentiary hearing.

offer. EH 74. His understanding at that point was that Mr. Nuwintore would be deported as the result of a plea, and he conveyed that belief to Mr. Nuwintore. EH 74. Mr. Nuwintore did not want to accept the offer. EH 75. Mr. Haydn-Myer continued working on the case. EH 76. That evening or the next morning he received a telephone call from petitioner's cousin telling him that petitioner was interested in pursuing a deal after all. EH 76-77.[5]

The next day, Mr. Haydn-Myer met with Mr. Nuwintore in the U.S. Marshal's lock-up and reviewed the terms of the deal that was on the table. Counsel had come to the conclusion that his client would be deported as the result of the deal, and he told Mr. Nuwintore so. EH 77-78. Mr. Haydn-Myer prepared his client for the Rule 11 colloquy, which involved review and confirmation of immigration consequences. EH 78-79. Specifically, "I thought the deportation would mean forcible or removal from the United States." EH 79.

In their final discussions of the plea, Mr. Haydn-Myer told Mr. Nowintore that he had not been able to talk to the immigration expert but that his own research indicated that "you're going to be deported." EH 87-88. He offered to contact the immigration lawyer who had handled Mr. Nuwintore's successful asylum application, but the offer was declined. EH 88.

When asked by petitioner's counsel why he had negotiated a plea that would "expose [petitioner] to death" via deportation, Haydn-Myer replied:

> Once again, sir, I was asked to negotiate by Mr. Nuwintore, but when I had the discussions with him about the deportation, where he was going, and he kept telling me, you know, he wasn't going back to Burundi, essentially, he informed me to negotiate and that's what I did. And it was like I was just taking direction from Mr. Nuwintore on that point.

EH 89-90.

////

---

[5] The phone calls from and to petitioner's "cousin" were contemporaneously documented in Mr. Haydn-Myer's case file. EH 76-77. Mr. Nuwintore testified in rebuttal that he has no cousin and he did not relay any message to counsel via a third party indicating that he had changed his mind about a plea. EH 110. The court finds Mr. Haydn-Myer's testimony on this point to be credible, and notes that petitioner's denial illustrates the unreliability of his testimony overall. Credibility issues are addressed more fully below.

Counsel was aware at the time he negotiated the final deal, and made Mr. Nuwintore aware, that the stipulation to a loss amount over $10,000 would mean that Mr. Nuwintore "was going to be deported." EH 100. In response to further questions about the loss amount and attorney-client conversations about its calculation and implications,[6] Mr. Haydn-Myer replied:

> [T]he only thing I remember was coming to the conclusion that Mr. Nuwintore was going to be deported. I remember Mr. Nuwintore acknowledging that he was going to be deported and then I do not remember discussing or even researching the $10,000.

EH 103-104.

> The only thing I remember telling him about the immigration on that point was. . . he was going to be deported because the amount was over $10,000. And I don't remember going into the other details about immigration law other than he was going to be, you know, removed from the United States. . .

> . . . I thought he was going to be removed from the United States. I thought his mother because she worked for the United Nations was going to somehow get him another place, in London, because they had the assets to do so.

EH 105-106.

### 3. Credibility Determinations and Related Factual Findings

The court finds Mr. Haydn-Myer's testimony to be generally credible, although his memory of pertinent events was partial. He was careful to acknowledge when he did not recall, and when he was basing his answers on his general practice as a criminal defense lawyer or on review of documents rather than on independent recollection of events. He was sufficiently certain of key matters to support the following findings: (1) Mr. Haydn-Myer advised Mr. Nuwintore on December 8, 2010, as documented in the attorney-client letter of that date, that the plea agreement would result in deportation; (2) Mr. Haydn-Myer did not tell Mr. Nuwintore that his previous grant of asylum would be unaffected by his conviction and would prevent deportation, or that the statements in the plea agreement and advisements in open court regarding

---

[6] Mr. Haydn-Myer was questioned at length about subsequent litigation of the loss amount in relation to sentencing. The court omits summary of that testimony, consideration of which is unnecessary for present purposes.

18

1   mandatory deportation would not actually apply to him; and (3) Mr. Nuwintore suggested to Mr.

2   Haydn-Meyer at some point that his deportation could result in his removal from the United States

3   to a country other than Burundi.

4       Mr. Nuwintore's testimony was frequently contradictory, as in his repeated statements –

5   practically in the same breath – that he was told and understood that he would be deported, and

6   that he would not be deported because of his asylum.  See, e.g., EH 23, 50.[7]  The court does not

7   doubt the sincerity with which Mr. Nuwintore has come to believe his version of events, but

8   sincerity does not indicate accuracy.  The court accepts as fully credible petitioner's testimony

9   that he feared for his life if returned to Burundi, and was adamant with Mr. Haydn-Meyer that he

10  wanted to avoid that outcome at all costs.  However, the court does not find credible petitioner's

11  uncorroborated insistence that Mr. Haydn-Meyer affirmatively told him that being an asylee would

12  prevent his deportation, and that his asylum status rendered inapplicable to him all the express

13  advisements from defense counsel, the prosecutor, and the judge that the plea would result in

14  deportation.  The court finds, to the contrary, that Mr. Haydn-Meyer made no such representation.

15  Haydn-Meyer clearly never believed any such thing.  Moreover, the attorney-client

16  correspondence dated December 8, 2010, documenting counsel's unconditional representation

17  that petitioner would be deported, demonstrates the unreliability of Mr. Nuwintore's testimony on

18  this central point.  It is entirely possible that Mr. Nuwintore subjectively believed at the time of

19  his plea that his asylum status would prevent his deportation – or at least would prevent his return

20  to Burundi, as reflected by his statements to counsel that deportees could go to third countries –

21  but such a belief cannot have been based on the information or advice given by Mr. Haydn-Meyer

22  because counsel gave no such advice.

23      Having considered all the testimony of both witnesses, in light of the above credibility

24  determinations, the court also finds it likely that the November 2010 offer was conveyed to Mr.

25  Nuwintore, along with the significance of admitting a loss amount under $10,000.  Even if the

26  _____

27  [7]  It is plausible that these contradictions reflect the ongoing confusion in this case between
    "deportation" in the sense of adjudicated status as removable, "deportation" in the sense of
    physical removal from the United States, and "deportation" in the sense of forcible return to
28  Burundi.  The court returns to this issue in the following discussion.

evidence on this point is inconclusive, the court is unpersuaded by petitioner's testimony and therefore finds the allegation unproven. Moreover, the court has little trouble finding that the significance of the loss amount vis-à-vis mandatory deportation was explained to Mr. Nuwintore by Mr. Haydn-Myer independently of the November 2010 offer.

## IV.     DISCUSSION

The Ninth Circuit found that petitioner's allegations, if proven, would establish that "counsel was ineffective by (1) failing to apprise Nuwintore that he would not be subject to automatic removal if he pleaded guilty to a loss of less than $10,000, and (2) neglecting to mention that even though Nuwintore might avoid actual removal, he would be charged with removability and suffer a loss of his asylum status." ECF No. 157 at 2. That is the law of the case. See Eichman v. Fotomat Corp., 880 F.2d 149, 157 (9th Cir. 1989) (under the law of the case doctrine, a decision on a prior appeal must be followed in all subsequent proceedings in the same case). Accordingly, the present question is whether petitioner has met his burden of proving either theory of ineffectiveness.

Analysis of the distinct theories identified by the Court of Appeals is unduly complicated by petitioner's consistent failure to distinguish – in his own testimony, in his questioning of Mr. Haydn-Myer, and in his post-hearing brief – between "automatic removal," "removability," and "loss of asylum status." Petitioner's testimony focused almost exclusively on the specter of "deportation," which he equated with return to Burundi and thus considers a death sentence. The court has found that Mr. Haydn-Myer affirmatively advised Mr. Nuwintore that the plea he entered on December 9, 2010, would result in his actual deportation.[8] Among the evidence supporting this finding is the December 8 attorney-client letter, which was not part of the record previously considered by the Ninth Circuit. Mr. Nuwintore's insistence that he accepted the plea only because he had been assured otherwise is unsupported by the evidence.

[8] To the extent that Haydn-Myer's prediction of actual removal from the United States reflects ignorance of the withholding of removal option, it was incorrect and arguably unreasonable. That matter is addressed below. To the extent Mr. Haydn-Myer meant a mandatory determination of removability, he was correct. Either way, petitioner's claim fails because the court finds that counsel did not tell him that his asylum status would prevent the application of mandatory removal.

The court has specifically rejected as unreliable Mr. Nuwintore's testimony that Mr. Haydn-Myer told him that his asylum status would protect him from otherwise-mandatory deportation. Petitioner has maintained throughout this coram nobis action that he pled guilty because Mr. Haydn-Myer told him that he would not actually be deported even though the plea agreement and the judge said he would be. The evidence simply does not support this allegation. The failure of proof on this crucial point distinguishes this case from United States v. Kwan, 407 F.3d 1005 (9th Cir. 2005), on which petitioner has relied.[9]

The related allegation that Mr. Haydn-Myer "fail[ed] to apprise Nuwintore that he would not be subject to automatic removal if he pleaded guilty to a loss of less than $10,000" is likewise unproved. Mr. Haydn-Myer credibly testified that he advised his client in response to the November 2010 offer that deportation (by which Haydn-Myer meant automatic removal) could be avoided by a plea that admitted a loss of under $10,000. Despite Haydn-Myer's lack of present recollection of the conversation, he was reasonably confident that he followed his general practice in relaying the offer. And he was quite clear in his understanding, then and now, about the significance of the $10,000 threshold for a felony to require removal. Petitioner affirmatively testified that he was aware prior to changing his plea that the admission of a loss over $10,000 meant automatic removal. EH 22. The court has found that the November 2010 offer was likely conveyed to Mr. Nuwintore, along with the significance of admitting a loss amount under $10,000, and that Mr. Nuwintore rejected the offer; and that the significance of the loss amount was explained independently of the November 2010 offer. Neither the fact that Mr. Haydn-Myer could not say whether he had read Nijhawan v. United States, 557 U.S. 29 (2009),[10] EH 104, nor

---

[9] In Kwan, the Court of Appeals ordered coram nobis relief on ineffective assistance of counsel grounds where counsel had "reassured [petitioner] that there was no serious possibility that his conviction would cause him to be deported," and told him to ignore the judge's warnings about immigration consequences, when pleading to an aggravated felony (bank fraud). Kwan, 407 F.3d at 1008.

[10] In Nijhawan, the Supreme Court held that an alien's stipulation at criminal sentencing to a loss amount over $10,000 supported a finding by the immigration court that the alien had been convicted of an "aggravated felony." The $10,000 threshold for an aggravated felony need not be an element of the criminal offense, but refers to the circumstances of the commission of the crime on a specific occasion. Id.

that Mr. Nuwintore did not recall Haydn-Myer using the term "aggravated felony," EH 109, changes the fact that Haydn-Myer accurately relayed the bottom line: admitting a loss above $10,000 would result in deportation, and admitting a loss below $10,000 would not.

Petitioner's post-plea challenge to the restitution amount cannot support an inference that petitioner belatedly recognized the immigration significance of a $10,000 loss and sought to avoid it. At the 2011 sentencing hearing, petitioner ultimately withdrew his challenge after the court noted that he was effectively seeking to withdraw from the plea agreement. ECF No. 142 at 56. Post-plea events are thus consistent with a deliberate decision by Mr. Nuwintore to secure the benefits of the plea agreement despite the consequence of mandatory deportation (or, at least, mandatory removability). This interpretation of the evidence is further supported by petitioner's pre-plea belief, expressed to counsel, that the immigration law provided for removal from the United States without forced return to Burundi.

For all these reasons, petitioner has not met his burden of proof on the performance prong of <u>Strickland</u> as to deficient advice regarding loss amount.

Finally, petitioner has failed to establish by a preponderance of the evidence that he would not have accepted the plea had Mr. Haydn-Myer explained "that even though Nuwintore might avoid actual removal, he would be charged with removability and suffer a loss of his asylum status" pursuant to the plea. Petitioner did not pursue this theory of the facts at the evidentiary hearing. Indeed, the only questions regarding the distinction between adjudication as removable and actual physical removal from the U.S. were posed by the court:

> THE COURT: Did [Haydn-Myer] discuss with you the difference between your status as. . . a lawful permanent resident as opposed to being removable? That's a status difference.

> MR. NUWINTORE: Right.

> THE COURT: And actually getting sent back to Burundi?

> MR. NUWINTORE: No.

> THE COURT: Did you discuss with Mr. Haydn-Myer at any time the concepts of removability and withholding of removal?

22

MR. NUWINTORE:  No.

EH 60.

The evidentiary hearing did not develop the theory that keeping or losing the protections of asylum status while remaining in the United States (as opposed to preventing a return to Burundi) was an important goal for petitioner that affected his decision-making about the plea. Petitioner's counsel did not attempt to prove this instance of deficient performance by questioning Mr. Haydn-Myer about his understanding of the difference between adjudication of removability and physical removal from the country, nor about the relationship between removability and asylum, nor about the option of withholding of removal on grounds of likely persecution.  Mr. Haydn-Myer was not asked whether he was aware of, or told Mr. Nuwintore about, the implications of Title 8 U.S.C.§ 1158(b)(2)(A)(ii) & (B)(i), which provide that asylum status must be revoked if the Attorney General determines that the alien was convicted of "a particularly serious crime," including an aggravated felony.  He was asked only about his familiarity with the law regarding mandatory removal.  EH 99 (discussing statutory requirement of mandatory removal for aggravated felonies), 104-105 (discussing Nijhawan, supra, a case about removal). These are related but distinct issues, as the Ninth Circuit's construction of petitioner's ineffective assistance claims reflects.  Petitioner failed to develop an evidentiary basis for a finding of deficient performance on this ground.

It must be noted that Mr. Haydn-Myer's testimony at the evidentiary hearing consistently failed to reflect any understanding of the relationship between mandatory removability, the loss of asylum, and alternatives to forced repatriation.  The undersigned fully agrees with the Ninth Circuit that the failure to identify and address these issues constitutes unreasonable performance by a criminal defense lawyer representing a client with political asylum.  Moreover, Mr. Haydn-Myer's failure to consult an immigration expert prior to negotiation of a plea was unreasonable in light of his own limited understanding.  It is clear that Mr. Haydn-Myer incorrectly believed that Mr. Nuwintore would be unable to avoid physical removal from the United States (though he was correct that petitioner would be mandatorily removable), and it was unreasonable of him to rely on his client's anecdotal information about a London option and to leave it to an immigration

23

attorney to sort out after the fact. However, even if it would be proper for this court to find unreasonable performance on grounds not expressly tendered by petitioner at the hearing, this theory cannot support relief because petitioner failed to establish prejudice.

Mr. Nuwintore was not asked how the loss of asylum status, apart from the threat of return to Burundi, would have affected his decision-making regarding the plea. Petitioner did give an affirmative answer to the question whether he would have held out for a more favorable plea bargain, or insisted on going to trial, had he been correctly advised of "the consequences you have now." EH 32. This vaguely-worded question and one-word answer, however, immediately followed one of Mr. Nuwintore's many statements that his life was in danger if he went back to Burundi. EH 32. This context indicates that petitioner was talking about the threat of actual removal rather than other consequences of asylum loss. There were no follow-up questions. Mr. Nuwintore did not identify any specific "consequences he has now," as a former asylee in withholding of removal status, that would have changed his mind about the plea in 2010. Petitioner thus failed to establish by a preponderance of the evidence that he would have chosen to go to trial rather than face adjudication of removability and loss of asylum status even without actual removal from the United States. This failure of proof dooms the alternative claim identified by the Ninth Circuit. See Strickland, 466 U.S. at 697; Lee,137 S. Ct. at 1966-67.

For all these reasons, the undersigned concludes that petitioner has failed to prove his Strickland claim, either as previously construed by this court or as construed by the Ninth Circuit. Accordingly, the petition for coram nobis should be denied.

CONCLUSION

Accordingly, for all the reasons set forth above, IT IS RECOMMENDED that the Amended Petition for Writ of Coran Nobis, ECF No. 140, be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Courts order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 29, 2019

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE